## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DAVID GROSS, and<br>CHARLES RUSSELL,<br><br>            PLAINTIFFS.<br>v.<br><br>PRINCE GEORGE'S COUNTY,<br>MARYLAND,<br>PRINCE GEORGE'S COUNTY POLICE<br>DEPARTMENT,<br>MALIK AZIZ,<br>DAVID ROBINSON,<br>JAMES McCREARY,<br>JORDAN SWONGER,<br>JACQULYN "JACKIE" RAFFERTY,<br>BRAD PYLE,<br>ANGELA ALSOBROOKS, and<br>DONNELL TURNER<br><br>            DEFENDANTS. | CIVIL ACTION No.:  8:24-cv-994<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

NOW COMES the Plaintiffs, David Gross and Charles Russell, by and through their attorney, Ray M. Shepard and The Shepard Law Firm and pursuant to the First, Fifth, and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §§ 1983 and 1988, Articles 24 and 40 of the Maryland Declaration of Rights, does hereby sue the Defendants, Prince George's County, the Prince George's County Police Department, Malik Aziz, David Robinson, James McCreary, Jordan Swonger, Jacqulyn Rafferty, Brad Pyle, Angela Alsobrooks, and Donnell Turner, for violations of their rights guaranteed by the United States Constitution and the Maryland Declaration of Rights.  In support of their causes of action, Plaintiffs allege as follows:

## PARTIES

1.      Plaintiff David Gross is a citizen of the United States residing in Charles County, Maryland.  David Gross was at all relevant times a police officer in the Prince George's County Police Department employed by Prince George's County, Maryland.  He was assigned to the Organized Crime Squad within the Washington Area Vehicle Enforcement ("WAVE") Unit. Before and after the events alleged in this Complaint, Gross consistently received outstanding performance appraisals from his chain of command.

2.      Plaintiff Charles Russell is a citizen of the United States residing in Prince George's County, Maryland.  Charles Russell was at all relevant times a police officer in the Prince George's County Police Department employed by Prince George's County, Maryland.  He was assigned to the Organized Crime Squad within the Washington Area Vehicle Enforcement ("WAVE") Unit and was Plaintiff Gross's immediate supervisor.  Before and after the events alleged in this Complaint, Russell consistently received outstanding performance appraisals from his chain of command.

3.      Defendant Prince George's County is a municipal corporation and body politic located in Prince George's County, Maryland.  Pursuant to the Prince George's County Charter, § 101, Prince George's County has all rights and powers of local self-government and home rule. Prince George's County maintains and operates a police force, known as the Prince George's County Police Department.  Police officers with the Prince George's County Police Department are employees of Prince George's County.  Prince George's County has *respondeat superior* liability for Plaintiffs' State Constitutional claims.

4.      Defendant Prince George's County Police Department (the "police department" or "PGPD") is the police force maintained and operated by Prince George's County, Maryland.

2

5.      Defendant Malik Aziz was at all relevant times the Chief of Police in the Prince George's County Police Department. Aziz is the ultimate approval authority within the police department for disciplinary actions initiated within the police department. Aziz is sued in his individual capacity.

6.      Defendant David Robinson was at all relevant times a police officer in the Prince George's County Police Department.  Robinson served as the Assistant Commanding Officer within the Internal Affairs division of the police department. Robinson retired from the police department after the events alleged in this Complaint.  Robinson is sued in his individual capacity.

7.      Defendant James McCreary was at all relevant times a police officer in the Prince George's County Police Department.  McCreary served as the Commanding Officer within the Internal Affairs division of the police department.  McCreary has been promoted to Deputy Chief of Police.  McCreary is sued in his individual capacity.

8.      Defendant Jordan Swonger was at all relevant times a police officer in the Prince George's County Police Department.  Swonger served as the Commanding Officer of the WAVE Unit within the police department.  Swonger has been promoted to Major. Swonger is sued in his individual capacity.

9.      Defendant Jacqulyn Rafferty was at all relevant times a police officer in the Prince George's County Police Department.   Rafferty served as Deputy Chief within the police department.  Rafferty is sued in her individual capacity.

10.     Defendant Brad Pyle was at all relevant times a police officer in the Prince George's County Police Department.  Pyle served as Commander of the Special Investigations Division within the police department.  Pyle is sued in his individual capacity.

11.     Defendant Angela Alsobrooks is the Prince George's County Executive. Alsobrooks directed that the cases of officer discipline involving the Plaintiffs within the Prince George's County Police Department be approved by her and/or her office.  Alsobrooks is sued in her individual capacity.

12.     Defendant Donnell Turner was at all relevant times the Inspector General for Prince George's County.  Turner reported directly to Alsobrooks and her office for matters relating to the officer discipline cases involving the Plaintiffs. Turner has since been sworn in as a Circuit Court Judge in Prince George's County. Turner is sued in his individual capacity.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Plaintiff's Federal Constitutional claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

14.     Notice was provided to the Prince George's County Attorney in accordance with Md. Cts. & Jud. Proc. Code § 5-304(b). **Exhibit 1.**

15.     This Court has supplemental jurisdiction over Plaintiff's State Constitutional claims pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(b) because multiple Defendants reside in the district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

17.     In 2018, the Commander of the WAVE Unit to which the Plaintiffs were assigned, Lt. Matthew Merterko, required all detectives assigned to WAVE to sign a secret "Confidentiality Agreement" which prohibited all detectives from discussing the Unit's use of global positioning

4

system ("GPS") tracking devices with anyone outside of the WAVE Unit.  The penalty for violating this policy was involuntary transfer out of the WAVE Unit.

18.     The WAVE Unit consists of two squads, the Organized Crimes Squad, and the Street Crimes Squad.

19.     GPS tracking devices were often used by detectives in the WAVE Unit to track vehicles believed to be stolen or which had been used in criminal activities.

20.     All WAVE detectives signed the secret Confidentiality Agreement, including Plaintiffs.

21.     In or about December 2018, the Hispanic National Law Enforcement Association NCR and the United Black Police Officers Association, together with individual Hispanic and Black police officers, sued Prince George's County, the former Chief of Police of the Prince George's County Police Department and others in the United States District Court for the District of Maryland.  The case was styled *Hispanic Nat'l Law Enforcement Assoc. NCR et al. v. Prince George's County, et al.,* Case No.: 8:18-cv-03821 (D. Md. 2018) (the "HNLEA Lawsuit").

22.     As part of the HNLEA Lawsuit, the plaintiffs in that case filed a comprehensive analysis of police department operations down to individual officer-level detail authored by Michael E. Graham (the "Graham Report") to demonstrate systemic racism and use of force policies within the police department.  The Graham Report was filed in the HNLEA Lawsuit on February 22, 2021 (8:18-cv-03821 ECF Doc. #445-13).

23.     While the HNLEA Lawsuit was progressing, WAVE detectives Conner Crowley and Channing Reed of the Street Crimes Squad were investigating Lamonte Henson for gun and drug offenses and identified a red Mercedes vehicle operated by Henson bearing Maryland "ghost

tags," vehicle license plates that are unregistered with the Maryland Department of Motor Vehicles.

24.     Plaintiffs Gross and Russell were not involved in the investigation of Henson and had no direct knowledge of the case.

25.     In or about June 2018, Detectives Crowley and Reed asked Plaintiff Gross, who was highly skilled in placing GPS tracking devices, to place a GPS tracking device on the red Mercedes driven by Henson after another officer was unable to affix the device.

26.     At this time, Lt. Merterko was in the process of retiring and leaving the police department.  Sgt. David Mohr became the acting commander of the Organized Crime Squad within WAVE until Lt. Jordan Swonger replaced Lt. Merterko as the commander of the WAVE Unit. Plaintiff Russell became the acting sergeant in the Organized Crime Squad of WAVE.  Sgt. Mohr was informed of the request to place a GPS tracking device on the red Mercedes driven by Henson and approved the request by sending a message to Plaintiff Gross stating he had a "green light" to place the device.

27.     Plaintiff Gross placed the GPS tracking device on the red Mercedes and Henson was arrested several weeks later, on June 27, 2018.  Henson was subsequently charged federally with gun and drug offenses.  Plaintiff Gross was not involved in the Henson case other than placement of the GPS device as a favor to Detectives Crowley and Reed.   Plaintiff Russell had nothing to do with the Henson case.

28.     At the time, Plaintiff Russell was Plaintiff Gross's immediate supervisor in the Organized Crime Squad of the Police Department's WAVE Unit; however, Russell was not informed of the request to place the GPS on Henson's vehicle.

29.    Upon information and belief, Detective Sean Kenney of the Street Crimes Squad wrote a probable cause statement for Henson's arrest that was reviewed by Sgt. David Mohr.  In compliance with the secret "Confidentiality Agreement," Mohr directed Kenney to delete all references to the placement of a GPS device on the red Mercedes.

30.    Investigating officers from the Street Crimes Squad of WAVE falsely informed Henson's federal prosecutor, Assistant U.S. Attorney Thomas Sullivan, that the red Mercedes had been located through random registration checks after the vehicle had fled from officers.  Upon information and belief, Detectives Sean Kenney and Shea Jefferson went so far as to walk AUSA Sullivan and the FBI through the scene of the vehicle stop in Capital Heights, with no mention of the GPS tracking device, when the tracking device was the real reason they were able to locate the vehicle prior to Henson's arrest.

31.    Plaintiffs Gross and Russell had no knowledge of the misrepresentations made to the FBI and AUSA Sullivan.

32.    While preparing the case for prosecution, AUSA Sullivan became aware of the GPS tracking device that was placed on Henson's car by members of the WAVE Unit without a warrant. FBI investigators were asked to determine why the police department had not disclosed the GPS device's deployment and instead had given a false explanation of how Henson's red Mercedes was located.

33.    Because Henson was not their case, Plaintiffs Gross and Russell had no knowledge regarding these events but did become aware the federal criminal case against Henson was in danger of dismissal.  Detective Sean Kenney asked Plaintiff Gross to call AUSA Sullivan regarding his placement of the GPS device, but never informed Gross that misrepresentations had already been made to the prosecutor.

34.     Plaintiff Gross called AUSA Sullivan and informed AUSA Sullivan that he had placed the GPS tracking device on the vehicle and that, if the GPS tracking device had not been disclosed to him by the investigating officers, the detectives likely omitted references to the GPS's deployment because of the secret "Confidentiality Agreement" all WAVE detectives were required to sign earlier that year.  This was the first time AUSA Sullivan had received any knowledge of the secret Confidentiality Agreement in the WAVE Unit.

35.     The charges against Henson were dismissed by AUSA Sullivan on February 22, 2019, after Plaintiff Gross' telephone call with AUSA Sullivan.

36.      Preceding this incident, it was common practice within the WAVE Unit to place GPS devices on vehicles without a warrant at the direction of supervisors. Numerous text messages show supervisors, such as now retired Sergeant David Mohr, "green lighting" a vehicle, which means detectives were authorized to place a GPS device on it.

37.     Immediately following the aftermath of the Henson case being dismissed, there were rumors of an investigation by the FBI and by the Police Department's Internal Affairs Division, however, Plaintiff Gross was never interrogated or otherwise given notice of any investigation regarding the Henson matter.  Likewise, Plaintiff Russell, who had nothing to do with the Henson case, was never given notice of any investigation regarding the Henson matter.

38.     Years later, Plaintiff Gross learned that Deputy Chief Jackie Rafferty "administratively" closed the Internal Affairs investigation to cover up and protect supervisors in the WAVE Unit who had implemented the secret Confidentiality Agreement.  Supervisors blamed Plaintiff Gross and his supervisor, Plaintiff Russell, for disclosing the Confidentiality Agreement to AUSA Sullivan and sought to retaliate against them for doing so.

39.    During a meeting with Lt. Swonger and Sgt. Joseph Bunts in approximately February 2019, Defendant Swonger told Plaintiff Russell he was going to be transferred out of the WAVE Unit.  Swonger stated, "you're an acting sergeant and I need a sergeant to take the fall." Plaintiff Russell had no idea what prompted this sudden transfer and asked why it was happening. Swonger said he needed to transfer two persons from each Squad in WAVE "to get the feds off our backs."

40.    Upon the recommendation of Lt. Swonger and with the approval of Lt. Col. Jackie Rafferty and Maj. Brad Pyle, Plaintiffs Gross and Russell were transferred out of the WAVE Unit and back to the bureau of patrol.  Also transferred were two detectives from the Street Crimes Squad within WAVE, Detectives Shea Jefferson and Sean Kenney.

41.    Defendant Jordan Swonger, who replaced Lieutenant Meterko, made Plaintiffs "scapegoats" and transferred them to retaliate against them for revealing the existence of the "Confidentiality Agreement" to federal prosecutors, and in response to the subsequent FBI inquiry. Lieutenant Swonger exaggerated and/or manufactured Plaintiffs' involvement in the Henson case to justify adverse employment actions against them.

42.    Plaintiffs Gross and Russell suffered financial loss and humiliation as a result of their reassignments/demotions out of the WAVE Unit.  Both were passed up for promotions, both lost opportunities for transfers, specialty pay and other benefits.

43.    Being removed from a specialty unit and transferred to the patrol division is a well-known informal discipline tactic widely used throughout the police department by supervisors and commanders. Plaintiffs Gross and Russell were not afforded the opportunity to transfer to another specialty unit but were only ordered to be placed in the bureau of patrol despite never receiving punishment, being charged, or even contacted by the Internal Affairs Division. Plaintiffs Gross

and Russell also had positive past performance appraisals completed by their supervisors with no write ups or negative comments. Despite all this, and upon information and belief, Plaintiffs were transferred out of the WAVE Unit because Gross disclosed the Confidentiality Agreement to federal prosecutors and Russell, his supervisor, failed to prevent him from doing so.

44.    The Prince George's County Police Department General Order Manual specifically states: "No Department employee shall retaliate against any person who, in good faith, initiates or provides information or testimony related to an investigation, prosecution, litigation or hearings related to the Department or Department employees regardless of the context in which the allegation is made, or because of such person's participation in the complaint process as a victim, witness, investigator, or decision-maker or reviewer." *See* Prince George's County Police Department General Order Manual Volume I, Chapter 38, Page 2.

45.    During this same time the HNLEA Lawsuit was continuing to progress. Defendant Angela Alsobrooks directed her Inspector General, Defendant Donnell Turner, to assume oversight and control of all disciplinary investigations and proceedings within the police department.  In compliance with Alsobrooks' directive, Turner became intimately involved in the police department's daily operations, investigations, and disciplinary actions. Defendant Turner informed the police department that all disciplinary actions would need approval from the office of the County Executive prior to implementation. Upon information and belief, Defendant Turner, at the direction of Defendant Alsobrooks, encouraged and directly influenced Internal Affairs and Police Department personnel to identify white officers—including Plaintiffs Gross and Russell—to be placed on the "Brady List" or "Do Not Call" List by the Prince George's County State's Attorney's Office to demonstrate that the police department's disciplinary processes were fair and balanced, and not skewed against minority officers as alleged in the HENLEA Lawsuit.

46.     During this time, Defendant James McCreary, the Commander of the Internal Affairs Division, was presenting cases directly to Defendant Turner for his input and directions that best suited the interests of the County Executive's Office. Defendant McCreary was also directed to provide names of officers, preferably white officers, and information regarding such officers to the State's Attorney's Office regarding "Brady List" or "Do Not Call List" placement. Defendants McCreary and Robinson delegated the task of identifying officers for the Brady List to Capt. Michael Smith in the Internal Affairs Department.

47.     Captain Smith originally identified officers for the Brady List by identifying officers that had been charged with misconduct and subsequently convicted.  When this produced a list of officers that was too short for Defendant Turner's liking, McCreary directed Capt. Smith to find more names for the list.  Plaintiffs Gross and Russell were added to the list even though Aziz, McCreary, Robinson, Swonger, Rafferty and Pyle knew they had done nothing wrong.

48.     Aisha Braveboy has stated that Defendant McCreary was directly providing her office names of officers to be placed on the "Brady List" or "Do Not Call List," together with justification for such placement.

49.     Plaintiff Russell retired from patrol on April 1, 2020.

50.     In early February 2021, Plaintiff Gross was informed that he would be included on the "Brady List" or "Do Not Call List" promulgated by the Prince George's County State's Attorney's Office.  Plaintiff Gross was further advised that the executive command staff of the police department, specifically acting Chief of Police Hector Velez, had directed that because of Plaintiff Gross' placement on the "Brady List" or "Do Not Call List," he was no longer allowed to work overtime or secondary employment through the police department, and could not have any contact with the citizens of Prince George's County in his official capacity as a police officer.

These broad restrictions constitute adverse employment actions that deprived Plaintiff Gross of income and opportunities afforded to other officers.

51.    On February 25, 2021, the American Civil Liberties Union of Maryland ("ACLU") demanded that Defendant Alsobrooks terminate top police department officials, as well as Officers mentioned in the Graham Report and the HNLEA lawsuit. The ACLU also called for widespread reform to the disciplinary procedures and oversight of the police department. *See* ACLU of Maryland demands top PGPD officers resign amid racism allegations (dbknews.com) (Last accessed 10/22/23.)

52.    Defendants Alsobrooks and Turner specifically directed Defendants Aziz, McCreary and Robinson to target white officers to cover up their pattern of misconduct towards minority officers mentioned throughout the HNLEA Lawsuit. Instead of addressing departmental misconduct towards minority officers within the police department, they targeted the Plaintiffs to aid in their narrative that discipline policies within the police department were fair and balanced, and not skewed against minority officers as alleged in the HNLEA Lawsuit.

53.    While the Law Enforcement Officer's Bill of Rights excluded Defendants McCreary and Robinson from administratively charging Plaintiff Gross due to the statute of limitations for such charges, and Plaintiff Russell was already retired, they collectively acted to cause Plaintiffs Gross's and Russell's placement on the Prince George's County State's Attorney's Office's "Brady List" or "Do Not Call" List without any wrongdoing on their part or any factual justification for doing so.

54.    On June 28, 2021, the Washington Post published a very widely viewed article relating to Defendant Alsobrooks spending approximately $17.6 million dollars litigating the HNLEA lawsuit. That enormous amount of taxpayer money being used by Defendant Alsobrooks

to combat the HNLEA lawsuit clearly shows just how invested and motivated the County was in its frantic defense of it. *See* [Prince George?s has spent millions defending its police department against a federal discrimination lawsuit. - The Washington Post](#) (Last accessed 10/22/23).

55. Ironically, just weeks earlier, Braveboy fired a State's Attorney's Office Investigator, retired Captain Meredith Bingley, for reporting to Braveboy her discovery of Internal Affairs Detective Cleo Savoy's criminal history, which included a conviction for second-degree assault for breaking a glass storm door, pointing her loaded police-issued handgun at her then-husband and his friend, and then fleeing the scene before other officers arrived. This information clearly should have been disclosed in accordance with the State's *Brady/Giglio* obligations in all of Savoy's cases and the failure to have done so taints all of Detective Savoy's prior cases, many of which were homicide cases.

56. For years, Detective Savoy, who is black, remained silent and failed to inform prosecutors of her criminal history. Upon information and belief, Detective Savoy is the only police officer ever to have been assigned to the Homicide and Internal Affairs divisions with a criminal record. This likely occurred because her conviction happened under her maiden name, Cleo M. Johnson. Detective Savoy was never transferred out of the specialty unit she was assigned, which represents a stark difference in Plaintiffs' treatment by the Defendants collectively.

57. Rather than recommend Defendant Savoy be placed on the "do not call" list or otherwise act to rectify the failure to disclose Savoy's criminal history over many years in her cases, which include homicide prosecutions, Aziz, McCreary and Robinson asked Braveboy to expedite and approved expungement of Savoy's criminal records upon her petition filed on May 4, 2021**.** When Defendant Savoy retired on December 31, 2021, Braveboy attended her retirement party and gave her an award.

58.    During this same period, Defendants Aziz, McCreary, Robinson, Turner, and Alsobrooks were also made aware of Detective Savoy's criminal history.  Rather than remove Savoy from the Internal Affairs division, they collectively ignored her misconduct and allowed her to continue in her position.

59.    On or about July 20, 2021, the parties in the HNLEA Lawsuit entered a Settlement Agreement filed in the action on July 30, 2021. (8:18-cv-03821 ECF Doc. #566-1).  Pursuant to the Settlement Agreement, the defendants agreed to pay the plaintiffs and their attorneys $5,290,000 and to revise the police department's promotion and internal disciplinary policies and to implement new General Orders within the police department.

60.    On October 29, 2021, Aisha Braveboy released the "Brady List" or "Do Not Call" list to the public and appeared on television. During televised news coverage, Braveboy described those officers on the list as "those who have lied" or are "racist, homophobic and sexist."   See ['Brady List': Prince George's Prosecutors Name Officers Barred From Testifying – NBC4 Washington (nbcwashington.com)](#) (Last accessed 01/09/2024).

61.    With the public release of the list, Braveboy also included the policy that that had been supposedly used to decide if an officer would be added to the "Brady List" or "Do Not Call List." In this policy it states the following:

> The officer made a material misstatement under oath, in an affidavit or probable cause statement, or whose dishonesty affected the charging status of a civilian; the officer was convicted of an impeachable offense or convicted of an offense that was committed in his/her official capacity; or the officer acted in a manner that demonstrates he/she is biased (i.e. racist, homophobic or otherwise prejudiced). Note: In instances where the evidence does not fall within the above categories, the SAO will exercise its discretion in reviewing the facts and circumstances to determine the appropriate action (i.e. when an officer is acquitted of an impeachable offense.)

62.    Neither Plaintiff Gross nor Plaintiff Russell met the criteria for inclusion on the Brady List.  Neither had ever made a materially false statement and neither was convicted of any offense. The two Plaintiffs were never notified of any investigation, they were never interviewed or investigated, and neither was ever charged internally with any misconduct, yet they were ultimately added to this public list based on the color of their skin.

63.    Throughout these events, Defendants Turner and Alsobrooks pushed the Prince George's County Police Department to vigorously pursue white officers for inclusion on the "Brady List" or "Do Not Call List" to quell public outcry regarding alleged discrimination against black and Hispanic officers as alleged in the ongoing HNLEA Lawsuit.

64.    Upon information and belief, several black officers were either not included, or were removed from the "Brady List" or "Do Not Call List" prior to it being released to the public. Defendants Aziz, McCreary and Robinson, as well as the other Defendants, specifically provided names and information to the State's Attorney's Office to fit their agenda while purposefully not disclosing others.

65.    For example, on May 11, 2017, Detective Adrian Crudup, who is black, was indicted on charges of witness intimidation, misconduct in office and accessory after the fact for his involvement in interfering with an ongoing police investigation. He was also charged with termination by the police department for these actions and is no longer a police officer. Despite this information, his name was not included on the public "Brady List" or "Do Not Call List" despite dozens of former police officers, including Plaintiff Russell, being named publicly on the list and despite the published policy. Upon information and belief, Crudup was not included or was taken off the list prior to it being released to the public due to him being a Plaintiff in the HNLEA Lawsuit.

66.     Corporal Cordell Barbour, who is black, was indicted for a theft scheme and other charges on October 25, 2016. He was found not guilty in September of 2018 in the Circuit Court of Prince George's County. Barbour was nevertheless demoted internally by the police department for his alleged misconduct. Upon information and belief, Barbour was never added or removed from the "Brady List" or "Do Not Call List" prior to the list being released to the public despite the published policy.

67.     Corporal Anthony Ayers, who is black, was found on the witness stand to be incredible by a Prince George's County Circuit Court Judge. Ayers was placed on the "Brady List" or "Do Not Call List" but was removed before the list was released to the public despite the published policy.

68.     Sergeant Jesse Spence, who is black, referred to Officer Thomas Lester, who is also black, as a "snitch boy" in a text message that was referring to Lester reporting another officer for alleged misconduct.  A photograph of this text message was taken and given to the State's Attorney's Office. Spence was never placed on the "Brady List" or "Do Not Call List" for calling a fellow black officer a "boy" despite the published policy.

69.     The Defendants also blatantly ignored criminal misconduct spanning from 2019 to 2021 involving Sergeant Spence in regard to alleged theft of time from Prince George's County that was provided to them in an unrelated case. The Internal Affairs Division never investigated Spence and never encouraged the State's Attorney's Office to place him on the "Brady List" or "Do Not Call List" for his alleged misconduct. This alleged criminal misconduct led Aisha Braveboy to publicly impeach Spence as a State's witness. Braveboy publicly stated the following: "new witness statements, additional records and *witness impeachment materials* led to the dismissal of charges." *See* [Charges Dismissed In Police Officers' Double-Dipping Case: Braveboy](#)

| Bowie, MD Patch  (Last Accessed 10/22/2023). Despite this, Spence was never added to the "Brady List" or "Do not Call List."

70.     In or about June 2023, Sergeant Thomas Hilligoss (who is an openly homosexual male officer assigned to Internal Affairs and a part of the police department's LGBQT outreach team) became aware of text messages involving Sergeant David Chandler and Sergeant Lamar Robinson, who are both black, that contained racist, homophobic, and sexist comments. Hilligoss, who was mentioned in the derogatory text messages in the group texts, became frustrated when Defendants Robinson and McCreary ignored these messages and refused to initiate any investigation or to discipline the black officers involved.  In fact, despite his degrading and culturally insensitive remarks, Sergeant Chandler was rewarded with a permanent daytime position in the Executive Command office working under Defendant McCreary. Neither Chandler nor Robinson were placed on the "Brady List" or "Do Not Call List" despite the published policy.

71.     During the HNLEA lawsuit litigation in 2021, the Defendants terminated Corporal Simon VanLeuven, a white officer, for a similar public social media post. VanLeuven's name was provided to the State's Attorney's Office at the direction of Defendant's McCreary, Robinson, Turner, and Alsobrooks and he was included on the list when it was released to the public.

72.     Officer Demarco Garcia, who is black, told a citizen to "get the fuck on the ground before I shoot you, nigger" and "get the fuck on the ground before I blow your fucking head off, nigger."  Garcia's violently racist statements were captured on body camera and several charges of using discriminatory language were sustained; however, his punishment consisted only of a short suspension without pay. Garcia was not added to the "Do Not Call" list for his violently racist public comments to a citizen despite the published policy.

73.    On September 22, 2022, the Assistant Chief of Police, Vernon Hale, who is black, referred to black citizens of Prince George's County as "monkeys" during a crime meeting.  This comment was made in the presence of numerous high-ranking officers, including Defendant McCreary, as well as other Internal Affairs command staff.  Two black officers at the meeting, Captain Calvin Tyson and Major Katina Gomez, were offended by this comment and voiced their concerns after the meeting.  Subsequently, Assistant Chief Hale circulated an email to the commanders at the meeting offering his "sincere apology" to those offended by his language. Hale was never suspended, investigated, reprimanded, nor administratively charged with this plainly culturally insensitive language." Assistant Chief Hale was not added to the "Brady List" or "Do Not Call" list despite the policy that was put into effect.

74.    In 2016, Cpl. Earl Sharpe, who is black, was administratively charged by the Internal Affairs Division for alleged misconduct involving workers compensation fraud. He was subsequently demoted in rank. Despite this alleged misconduct, and his demotion he was not included on the public "Brady List" or "Do Not Call List." Upon information and belief, the Defendants collectively lobbied to exclude him from the list due to him being a plaintiff in the HNLEA Lawsuit against Prince George's County.

75.    Cpl. Michael Brown, who is black, was terminated due to an off-duty incident that occurred in Washington, D.C. that involved him pointing his duty firearm at a citizen during an altercation. Brown was ultimately terminated from the police department for this alleged misconduct. Despite this misconduct and termination, Brown was not included on the Brady List due to him being a Plaintiff in the HNLEA Lawsuit against Prince George's County.  In contrast, Corporal James Thornley, who is white, was added to the public Brady List for an off-duty incident involving his duty firearm.

76.     Cpl. Clarence Rucker, who is black, was suspended by the Internal Affairs Division in 2015 for having inappropriate relations with victims while assigned to the Criminal Investigations Division, Domestic Violence Unit. He resigned before any final discipline. Despite his blatant misconduct, the Defendants did not provide his information to the State's Attorney's Office to be added to the "Brady List" or "Do Not Call List" because he was a Plaintiff in the HNLEA Lawsuit. In contrast, Lieutenant Richard Tallant, who is white, was added to the public list for alleged inappropriate conduct with a female subordinate.

77.     These incidents are a few of many blatant examples of the Defendant's selectively targeting white officers, such as Plaintiffs Gross and Russell, to be placed on the "Brady List" or "Do Not Call List," to further advance their HNLEA Lawsuit defense narrative regarding fair and balanced police reforms. During this time, Defendants Aziz, McCreary and Robinson, at the direction of Defendants Turner and Alsobrooks, were selectively providing information to the Prince George's County State's Attorney's Office regarding the "Brady List" and "Do Not Call List."

78.     Defendants Alsobrooks and Turner, instead of addressing departmental misconduct towards minority officers within the police department, intentionally instructed the senior police leader Defendants to target the Plaintiffs to make the police department's discipline policies appear more balanced as part of the County's enormous efforts to answer the allegations being leveled against the police department in the HNLEA Lawsuit. Defendant Alsobrooks used the Internal Affairs division to bolster the addition of white officers to the "Brady List" or "Do Not Call List" that was intended to make it appear as if her office was addressing the issues of discrimination alleged in the HNLEA lawsuit and to protect her image as County Executive in furtherance of her own political campaigns and aspirations.

79.    As a direct and proximate result of the Defendants' combined and calculated actions, Plaintiffs Gross and Russell were defamed and slandered on a local and national level. A Google search of their names does not reveal all the exceptional work they participated in throughout their careers but instead leads to numerous articles about the "Brady List" or "Do Not Call List." Neither the articles on the internet nor the stains to their reputations can be erased.

80.    If Plaintiff Gross attempts to transfer to a different agency, apply for a different position, or leave the field of policing altogether, every background check or questionnaire will require him to disclose his public placement on the Brady List. This malicious targeting has completely derailed his career and personal life. Plaintiff Gross was also passed over on several transfer opportunities because of his duty status and the stigma surrounding him and was not allowed to work overtime and secondary employment afforded to the numerous black officers that were purposefully not included or were removed from the "Brady List" or "Do Not Call List."

81.    Likewise, Plaintiff Russell's career was permanently damaged.  Not only was Plaintiff Russell forced to retire as a patrol officer, but he has also been rejected for many lucrative jobs he has applied for since retirement because of the damage to his reputation arising from his placement on the Brady List.

82.    Both Plaintiffs have suffered financial losses as a direct and proximate result of their removal from the WAVE Unit and also from their inclusion on the "Brady List" or "Do Not Call List."

COUNT I
FIRST AMENDMENT
UNLAWFUL RETALIATION
42 U.S.C. § 1983
(David Gross v. David Robinson, Malik Aziz, James McCreary,
Jordan Swonger, Jacqulyn Rafferty, Brad Pyle,
Angela Alsobrooks, and Donnell Turner)

83.     Plaintiff Gross incorporates the previous allegations in paragraphs 1 through 80 as if restated herein verbatim.

84.     Federal law imposes liability on anyone who, under the color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983.  As set forth herein, the Defendants acting under color of state law deprived Plaintiff of rights, privileges, or immunities protected by the First Amendment of the United States Constitution.

85.     "The First Amendment . . . 'prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett,* 139 S.Ct. 1715, 1722 (2019)(quoting *Hartman v. Moore*, 547 U. S. 250, 256 (2006)). If an official takes adverse action against someone based on that forbidden motive, and "nonretaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Id.; see also Crawford-El v. Britton,* 523 U. S. 574, 593 (1998); *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U. S. 274, 283-284 (1977).

86.     Citizens do not surrender their First Amendment rights by accepting public employment.  *Lane v. Franks,* 573 U.S. 228, 231 (2014).  A public employee's free speech rights are limited only to accommodate their employer's valid interest in controlling the workplace. *Pickering v. Board of Education,* 391 U.S. 563 (1968).  Accordingly, a public employee's speech is deserving of First Amendment protections when the speech involves a matter of public concern.

*Lane,* 573 U.S. at 237.  Speech involves a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps,* 562 U. S. 443, 453 (2011).  The inquiry turns on the "content, form, and context" of the speech. *Connick v. Myers,* 461 U. S. 138, 147-148 (1983).  Public employee speech relating to matters of public corruption qualifies as speech related to matters of significant public concern.  *Lane,* 573 U.S. at 240-41.

87.    Plaintiff Gross exercised his right under the First Amendment to report and to criticize the WAVE Unit's secret "Confidentiality Agreement" which prohibited all detectives in WAVE from discussing the Unit's use of global positioning system ("GPS") tracking devices with anyone outside of the WAVE Unit.  Gross disclosed the existence of the secret "Confidentiality Agreement" to federal prosecutors engaged in a felony criminal prosecution Lamonte Henson to explain why PGPD police officers may have failed to disclose or made incorrect disclosures to the prosecution regarding the manor in which detectives located Henson's vehicle.

88.    Corrupt police practices, such as the maintenance of a secret Confidentiality Agreement intended to, and which did prevent police officers from candidly describing their investigations to prosecutors, is a matter of public concern. The First Amendment of the United States Constitution prohibited the government from retaliating against Plaintiff Gross based on his statements concerning matters of public importance.

89.    Each of the defendants acted intentionally and maliciously to punish Plaintiff Gross for his protected speech by, among other actions, initiating, recommending, continuing and/or approving the adverse employment actions herein described against Plaintiff.  The defendants acted with malicious intent to retaliate against Plaintiff and to punish Plaintiff for his protected

speech, with reckless or callous indifference to Plaintiffs' rights and thereby to intentionally harm the Plaintiff.

90.     As a direct and proximate result of the Defendants' retaliation, Plaintiff Gross suffered humiliation, severe reputational damage, unwanted reassignments, decrease in pay and benefits, loss of job title and supervisory responsibility, reduced opportunities for promotion, and work restrictions resulting in financial losses, loss of overtime opportunities, and other damages.

WHEREFORE, Plaintiff Gross demands economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by 42 U.S.C. § 1988.

COUNT II
FIFTH & FOURTEENTH AMENDMENTS
STIGMA PLUS CLAIMS
42 U.S.C. § 1983
(David Gross and Charles Russell v. Malik Aziz, David Robinson,
James McCreary, Jordan Swonger, Jacqulyn Rafferty,
Brad Pyle, Angela Alsobrooks, and Donnell Turner)

91.     Plaintiffs incorporate the previous allegations in paragraphs 1 through 80 as if restated herein verbatim.

92.     Federal law imposes liability on anyone who, under the color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983.  As set forth herein, the Defendants acting under color of state law deprived Plaintiffs of rights, privileges, or immunities protected by the Fifth and Fourteenth Amendments of the United States Constitution.

93.     The Fifth and Fourteenth Amendments to the United States Constitution prohibit the government from depriving Plaintiffs of "life, liberty, or property" without due process of law.

"The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021)(citing *Kerry v. Din,* 576 U.S. 86, 91-92 (2015)). A plaintiff claiming reputational injury "must show [(1)] a statement 'stigmatizing his good name' and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that 'alter[s] or extinguishe[s] one of his legal rights." *Id.* (quoting *Paul v. Davis,* 424 U.S. 693, 706-711 (1976)).

94.     As more particularly described herein the Defendants made, caused to be made, and/or approved of multiple false statements, misrepresentations, and false reports to Prince George's County Prosecutors designed to convince the prosecutors that the Plaintiffs should be placed on the "Brady List" or "Do Not Call List," which identified officers who "made a material misstatement under oath, in an affidavit or probable cause statement, or whose dishonesty affected the charging status of a civilian; the officer was convicted of an impeachable offense or convicted of an offense that was committed in his/her official capacity; or the officer acted in a manner that demonstrates he/she is biased (i.e. racist, homophobic or otherwise prejudiced)."

95.     On October 29, 2021, Aisha Braveboy released her "do not call" list to the public and appeared on television. During televised news coverage, Aisha Braveboy described the officers on the list as "those who have lied" or are "racist, homophobic and sexist."

96.     Plaintiffs' constitutionally protected liberty interests in their reputations under the Fifth and Fourteenth Amendments to the United States Constitution were severely and permanently damaged and their ability to continue to work as police officers was negatively affected.

97.     In addition to the public campaign to stigmatize and humiliate the Plaintiffs, the Plaintiffs suffered unwanted transfers within the PGPD, demotions, suspensions, loss of benefits

and promotion opportunities, loss of pay, loss of job title and supervisory responsibility, and Plaintiff Gross was restricted in his duties and prevented from having public contact and prevented from performing his duties as a police officer, and Plaintiff Russell was forced into early retirement as a patrol officer. After leaving the PGPD, Plaintiff Russell has been denied numerous employment opportunities because of his placement on the Brady/Do Not Call List.

98.     The police officer defendants, acting in collusion with each other and at the direction of Defendants Alsobrooks and Turner, intended to cause the State's Attorney's Office to place the Plaintiffs on the "Brady List" or "Do Not Call List" without any proper justification.

99.     The Defendants lacked any reasonably good faith belief that the Plaintiffs should be included on the "Brady List" or "Do Not Call List" but acted to cause their placement on the list anyway. In doing so, the Defendants acted intentionally and maliciously, with an evil motive and ill will towards the Plaintiffs, with reckless or callous indifference to Plaintiffs' rights and intending to cause actual harm to the Plaintiffs.

WHEREFORE, Plaintiffs demand economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by 42 U.S.C. § 1988.

COUNT III
FIFTH AND FOURTEENTH AMENDMENTS
EQUAL PROTECTION
42 U.S.C. § 1983
(David Gross and Charles Russell v. Malik Aziz, David Robinson,
James McCreary, Jordan Swonger, Jacqulyn Rafferty,
Brad Pyle, Angela Alsobrooks, and Donnell Turner)

100.     Plaintiffs incorporate the previous allegations in paragraphs 1 through 80 as if restated herein verbatim.

101.    Federal law imposes liability on anyone who, under the color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983.  As set forth herein, the Defendants acting under color of state law deprived Plaintiffs of rights, privileges, or immunities protected by the Fifth and Fourteenth Amendments of the United States Constitution.

102.    The Equal Protection Clauses of the Fifth and Fourteenth Amendments of the United States Constitution prohibit the government from subjecting its employees to disparate treatment in the terms or conditions of their employment or in taking adverse employment actions based on race or color.

103.    Plaintiffs Gross and Russell are both white.

104.    Prior to their placement on the "Brady List" or "Do Not Call List," Plaintiffs Gross and Russell consistently received outstanding performance appraisals from their chain of command and in every respect satisfactorily performed their duties as police officers.

105.    As described more fully herein, both Plaintiffs Gross and Russell were subjected to adverse employment actions, including but not limited to placement on the "Brady List" or "Do Not Call List," unwanted transfers within the PGPD, demotions, suspensions, loss of benefits and promotion opportunities, loss of pay, loss of job title and supervisory responsibility, and Plaintiff Gross was restricted in his duties and prevented from having public contact and prevented from performing his duties as a police officer, and Plaintiff Russell was forced into early retirement as a patrol officer.

106.    As set forth herein, Plaintiffs Gross and Russell were placed on the "Brady List" or "Do Not Call List" while other similarly situated officers who were not white received more favorable treatment.

107.    As a direct and proximate result of the unlawful discrimination, Plaintiffs Gross and Russell have suffered significant damages.

WHEREFORE, Plaintiffs demand economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by 42 U.S.C. § 1988.

COUNT IV
ARTICLE 40 OF THE MARYLAND DECLARATION OF RIGHTS
UNLAWFUL RETALIATION
(All Plaintiffs v. All Defendants)

108.    Plaintiff incorporates the previous allegations in paragraphs 1 through 80 and 84 through 90 as if restated herein verbatim.

109.    Article 40 of the Maryland Declaration of Rights provides free speech protections *at least* coextensive with the First Amendment of the United States Constitution. *DiPino v. Davis,* 354 Md. 18, 43, 729 A.2d 354, 367 (1999)(citing *Jakanna v. Montgomery County,* 344 Md. 584, 689 A.2d 65 (1997)).

110.    Article 40 of the Maryland Declaration of Rights provides that "the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Importantly, Article 40 is capable of a different interpretation than the First Amendment. *Clear Channel Outdoor v. Dep't of Fin.,* 472 Md. 444, 457 (2021); *State v. Brookings,* 380 Md. 345, 350 n.2 (2004)(the Maryland Supreme Court has "emphasized that, simply because a Maryland constitutional provision is *in pari materia* with the federal one . . . does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart.")(citing *Dua*

*v. Comcast Cable,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002) and *DiPino v. Davis,* 354 Md. 18, 43, 729 A.2d 354, 367 (1999)("In certain contexts the contours of the State Constitutional rights are not precisely those of the Federal.").

111.    The First Amendment has been interpreted to protect the speech of government employees only when their speech is a matter of "public concern" and the government lacks an adequate justification for treating the employee differently from the public at large.  The language of Article 40 "that *every citizen* of the State ought to be allowed to speak, write and publish his sentiments *on all subjects,*" suggests broader application in which one's employment status is irrelevant, and protections apply not only to matters of public concern, but also to matters of private concern, *i.e.,* "*on all subjects.*"  Article 40 (emphasis added).

112.    Prince George's County and/or the Prince George's County Police Department have *respondeat superior* liability for Defendants David Robinson, James McCreary, Jordan Swonger, Jacqulyn Rafferty, Brad Pyle, Angela Alsobrooks, and/or Donnell Turner's violation of Plaintiffs' rights secured by Article 40 of the Maryland Declaration of Rights.

WHEREFORE, Plaintiffs demand economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

COUNT V
ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS
STIGMA PLUS CLAIMS
(All Plaintiffs v. All Defendants)

113.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 80 and 92 through 99 as if restated herein verbatim.

114.    Article 24 of the Maryland Declaration of Rights is the Maryland counterpart to the due process clauses found in the Fifth and Fourteenth Amendments to the United States Constitution and are in *pari materia* with its federal counterparts. *Allmond v. Dep't of Health & Mental Hygiene,* 448 Md. 592, 609 (2016).

115.    Prince George's County and/or the Prince George's County Police Department have *respondeat superior* liability for Defendants David Robinson, James McCreary, Jordan Swonger, Jacqulyn Rafferty, Brad Pyle, Angela Alsobrooks, and/or Donnell Turner's violation of Plaintiffs' rights secured by Article 24 of the Maryland Declaration of Rights.

WHEREFORE, Plaintiffs demand economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

COUNT VI
ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS
EQUAL PROTECTION
(All Plaintiffs v. All Defendants)

116.    Plaintiffs incorporate the previous allegations in paragraphs 1 through 80 and 101 through 107 as if restated herein verbatim.

117.    Although the Maryland Constitution contains no express equal protection clause, it is settled that the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment. *Myong Nam Kim v. Bd. of Liquor License Comm'rs for Balt. City,* 255 Md. App. 35, 60 (Md. App. 2022)(citing *Murphy v. Edmonds,* 325 Md. 342, 353-43, 601 A.2d 102 (1992); *Hargrove v. Bd. of Trs.*, 310 Md. 406, 416, 529 A.2d

1372 (1987)); *see also Manikhi v. Mass. Transit Admin.,* 360 Md. 333, 361, 758 A.2d 95, 110 (2000).

118.    Prince George's County and/or the Prince George's County Police Department have *respondeat superior* liability for Defendants David Robinson, James McCreary, Jordan Swonger, Jacqulyn Rafferty, Brad Pyle, Angela Alsobrooks, and/or Donnell Turner's violation of Plaintiffs' rights secured by Article 24 of the Maryland Declaration of Rights.

WHEREFORE, Plaintiffs demand economic, noneconomic, and punitive damages against the aforesaid defendants, jointly and severally, in an amount to be determined at trial, together with reasonable attorney's fees, expert witness fees and other costs as permitted by law.

## DEMAND FOR JURY TRIAL

119.  Plaintiffs respectfully demand trial by jury.

April 4, 2024                                             Respectfully Submitted,

                                                         /s/Ray M. Shepard
                                                         Ray M. Shepard, Bar No. 09473
                                                         The Shepard Law Firm, LLC
                                                         122 Riviera Drive
                                                         Pasadena, Maryland 21122
                                                         Phone: 410-255-0700
                                                         Facsimile: 443-773-1922
                                                         Email: Ray@Shepard.Law

                                                         *Counsel for Plaintiffs David Gross and George Russell.*