**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DAVID GROSS, *et al.*,

*Plaintiffs*,

v.

PRINCE GEORGE'S COUNTY, MARYLAND*, et al.*,

*Defendants.*

Case No. 24-cv-994-ABA

**MEMORANDUM OPINION**

Plaintiffs David Gross and Charles Russell contend that while employed by the Prince George's County Police Department ("PGPD") they were demoted and were included on a list of officers who would no longer be called to testify in criminal cases. Plaintiffs have sued the PGPD and Prince George's County, and several PGPD and County officials, alleging that Defendants punished them for protected speech, unlawfully disseminated information that harmed their reputations without due process, and treated them unequally because of their race. For the reasons below, Defendants are entitled to summary judgment on Plaintiffs' claims.

## I. BACKGROUND[1]

### A. The Henson case

The Washington Area Vehicle Enforcement ("WAVE") Unit is a component of the PGPD with two squads: Organized Crimes and Street Crimes. ECF No. 49-1 (Gross

---

[1] When considering a motion for summary judgment, the Court must construe the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

Declaration) ¶ 2. Gross joined the WAVE Unit's Organized Crime squad in 2016, where he served as a detective. ECF No. 46-2 (Gross interrogatory responses) at 2.

The events underlying this case began in 2018. Plaintiffs contend that during that year, the lieutenant in charge of WAVE "required all detectives assigned to WAVE to sign a secret 'Confidentiality Agreement' which prohibited all detectives from discussing the Unit's use of global positioning system ('GPS') tracking devices with anyone outside of [WAVE]." *Id.*; *see also* ECF No. 49-2 (Russell Declaration) ¶ 3.[2] According to Plaintiffs, anyone who violated this policy would be subject to "immediate transfer out of the unit." ECF No. 46-2 at 4. In 2018, Gross was first supervised in the Organized Crime squad by Sgt. David Mohr and then, upon Mohr's retirement that year, by Plaintiff Charles Russell. ECF No. 49-1 ¶ 2.

In June 2018, members of the Street Crime squad asked Gross to place a GPS tracker on the car of a suspect, Lamonte Henson. ECF No. 49-1 ¶ 4; ECF No. 49-5 (2023 Internal Affairs memorandum) at 1. This was not Gross's squad and he was not otherwise involved in the Henson investigation, but he was told by a detective in the Street Crimes squad that Sgt. Mohr (Gross's supervisor at that time) had approved the GPS tracker. ECF No. 49-1 ¶ 4. Gross was asked to assist due to his experience placing trackers, as several other officers had tried and failed. ECF No. 46-2 at 3. Gross successfully placed the tracker on Henson's car. ECF No. 49-1 ¶ 4.

Henson was arrested and was indicted in federal court. *See United States v. Henson*, Case No. 18-cr-574-GJH (D. Md.); ECF No. 49-5 at 1–2. He filed a motion to

[2] Defendants state they were unable to locate this Confidentiality Agreement for production, so it is not in the summary judgment record.

suppress evidence that law enforcement obtained during his arrest, contending that based on the information in police reports that had been produced in discovery, law enforcement did not have a sufficient basis to stop the car he was driving or to arrest him. *Henson*, Case No. 18-cr-574-GJH, ECF No. 14 (Dec. 13, 2018) at 4–6 & 11–12. At the time of the motion, federal prosecutors had not disclosed that law enforcement had been tracking his movements using a GPS tracker. It turned out the reason that information was not disclosed was because it had been concealed from federal prosecutors by the WAVE Unit. In advance of a hearing in the criminal case on Henson's suppression motion, the federal prosecutor assigned to the case, Assistant United States Attorney ("AUSA") Thomas Sullivan, conducted a walkthrough of the area where Henson's car had been stopped with WAVE detectives. The detectives still did not inform him of the GPS tracker at that time and had never obtained a warrant for it. ECF No. 49-1 ¶¶ 5–8; ECF No. 49-5 (2023 Internal Affairs memorandum) at 3–4.

Following that walkthrough, a detective in the Street Crimes squad, Sean Kenney, "informed [Gross] that during interactions with the federal prosecutor, he and the other Street Crimes officers did not inform AUSA Sullivan that a GPS tracker was used" and "asked [Gross] to call" AUSA Sullivan. ECF No. 49-1 ¶ 5. According to Gross, during the call he told Sullivan that he "had placed a GPS device and explained why [he] believed other officers involved in the Henson case likely had not previously disclosed it, including reference to the WAVE Unit's secret Confidentiality Agreement." *Id.* ¶ 6.[3]

[3] The record is not clear concerning whether Gross's call was the first time Sullivan learned of the GPS tracker or if Sullivan had already been told of it by another WAVE detective prior to Gross's call. *Compare* ECF No. 49-1 ¶¶ 5–6 (Gross's declaration stating that Kenney "informed [him] that during interactions with the federal prosecutor, he and the other Street Crimes officers did not inform AUSA Sullivan that a

Gross claims that this call was not "part of [his] normal job duties as a WAVE Unit detective" because he was not otherwise involved in the investigation and "had no official responsibility for communicating with federal prosecutors about the case." *Id.* ¶ 7. Instead, Gross's "purpose in making the call was simply to ensure the federal prosecutor had accurate information about the GPS device and to offer an explanation as to why the Street Crimes detectives involved in the Henson case . . . likely did not inform him[.]" *Id.* ¶ 8. The government moved to dismiss the case against Henson on February 19, 2019, shortly after learning of the warrantless tracker. ECF No. 49-6 at 3; *see also Henson*, Case No. 18-cr-574-GJH, ECF No. 20 (D. Md. Feb. 19, 2019).

Soon after the Henson case was dismissed, Gross and Russell were "transferred out of WAVE and . . . sent back to patrol." ECF No. 49-1 ¶ 12; ECF No. 49-2 ¶ 6; *see also* 49-6 at 5. Gross contends that this demotion was in retaliation for discussing the GPS tracker and Confidentiality Agreement with AUSA Sullivan. *See* ECF No. 49 at 24. In June 2019, in response to a complaint from Sullivan, the PGPD's Inspector General ("IG"), Defendant Donnell Turner, conducted an investigation of the Henson case, and found that multiple WAVE detectives, including Gross, had provided misleading information to the AUSA. ECF No. 49-6 at 3–4. Turner interviewed AUSA Sullivan, who stated that during the phone call with Gross about the GPS tracker, Gross had told him the investigation was "kind of off the books." *Id.* at 3. Turner recommended that Gross,

---

GPS tracker was used. . . . During my call to AUSA Sullivan, *I informed [him]* that I had placed a GPS device") (emphasis added) *with* ECF No. 49-5 at 2 ("[A] few days before the scheduled suppression hearing, AUSA Sullivan received a phone call *from [Kenney] advising* that the involved detectives . . . had placed a GPS tracker on Mr. Henson's vehicle prior to his arrest.") (emphasis added); *see also* ECF No. 49-6 at 3 (IG report stating that, according to AUSA Sullivan, Kenney's call was "the first time" that Sullivan was made aware that a GPS tracker had been installed on Henson's car").

Russell, and three other WAVE detectives be referred to the Internal Affairs unit for a formal investigation. *Id.* at 4. Defendant Jordan Swonger, the lieutenant who had taken command of WAVE in January 2019, also looked into the GPS tracker and Henson's prosecution. His findings are summarized in a February 2021 memo. ECF No. 49-7; *see also* ECF No. 49-3 (Swonger deposition). Lt. Swonger concluded that both Gross and Russell were aware that the GPS tracker was placed unlawfully, and that Gross had "[m]islead [sic] and then provided false information to the [Assistant] US Attorney[.]" ECF No. 49-7 at 5.

PGPD's Internal Affairs ("IA") Unit eventually investigated the case. As reflected in a March 2023 memo, an IA Sergeant interviewed Gross, Kenney, and AUSA Sullivan, as well as other law enforcement officers who had knowledge of the events. ECF No. 49-5. The report states that AUSA Sullivan corroborated Gross's account that Gross was not involved in the walk-through at the scene of the arrest or any meetings at which other WAVE detectives failed to disclose the GPS tracker. *Id.* at 6. The IA report concluded that "[b]ased on the information provided by" Gross and the AUSA, "it appears that the information" contained in IG Turner's report regarding Gross's "involvement in the arrest and federal prosecution of [Mr.] Henson was mistaken." *Id.* at 6. Specifically, the IA Report concluded that both Gross and AUSA Sullivan's statements indicated that Gross was not present at the walk through or case meetings at which WAVE detectives failed to disclose the GPS tracker. *Id.* The IA Report does note that Kenney maintained that Gross *was* present at the walkthrough, but concludes that it is "conceivable that [Kenney's] recollection of who was present was inaccurate." *Id.* The IA investigation against Gross and Russell was "closed administratively without further action" because

the statute of limitations to charge them under Maryland's Law Enforcement Officers' Bill of Rights statute had elapsed. *Id.* at 2.

After being initially transferred out of the WAVE Unit in 2019 after the Henson dismissal, Gross was transferred back to the WAVE Unit in August 2022. ECF No. 46-2 at 10. Gross contends that this transfer back to the WAVE Unit was *also* retaliatory. *Id.* at 15. He then faced additional administrative charges, which were later dismissed, and was transferred back to patrol again in October 2024. *Id.* He contends that during some of his time on patrol, he was prevented from obtaining "part-time or secondary employment." *Id.* at 13. Gross remains employed by the PGPD. *Id.* at 14 ("My hope is to come to a settlement where I can retire from the [PGPD] and move on with life[.]").

Russell retired in April 2020, and contends he has had difficulty finding employment since then, which he attributes to Defendants' actions. ECF No. 46-3 at 2.

**B. The do-not-call list**

In early 2021, the Prince George's County State's Attorney's Office ("SAO") began to compile an internal "do-not-call" list of police officers whom it would no longer call to testify in criminal prosecutions. The list was compiled in the first instance by Assistant State's Attorney ("ASA") Renee Joy, who was a member of the SAO's Public Integrity unit. ECF No. 46-4 (Joy deposition) at 17-18 (16:17–17:5). Joy drew from discussions with members of the PGPD (especially the IA division), Prince George's County Office of Law, and SAO to initially identify officers for inclusion. *Id.* at 22 (21:4–22). Among others, ASA Joy discussed the list with IG Turner, then-State's Attorney Aisha Braveboy, SAO Principal Deputy Jason Abbott, Defendant James McCreary (commanding officer of IA), Defendant David Robinson (assistant commanding officer of IA), and Defendant Malik Aziz (chief of police). *Id.* at 22–23 (21:4–22:17). She testified that her main

contact regarding information from the PGPD that could be relevant for the do-not-call list was Jack Mitchell, a Prince George's County Office of Law attorney assigned to handle PGPD matters. *Id.* at 22, 26 (21:4–13, 25:2–20).

Joy testified that she first learned of the misconduct allegations regarding Plaintiffs from either IG Turner or AUSA Sullivan. *Id.* at 29 (28:7–17). Regardless of where she first learned of the allegations, she spoke with AUSA Sullivan regarding the Henson incident and the GPS tracker. *Id.* at 31 (30:3–31:4). She then obtained and viewed the IA files for the WAVE detectives involved, including Gross and Russell. *Id.* at 32–33 (31:15–32:19). ASA Joy's review of Gross and Russell occurred before the 2023 IA report that concluded Gross may not have been involved in misleading the AUSA. In other words, at the time of the SAO's review in 2021, the files indicated more definitively that Gross and Russell had committed misconduct. Based on this information, she included Gross and Russell on the internal do-not-call list. *Id.* at 33 (32:6–19). Joy also, at some point in 2021, reviewed Lt. Swonger's memo regarding the incident and spoke with him over the phone, though the record is not clear regarding whether this took place before or after her initial inclusion of Gross and Russell on the list. *Id.* at 49–50 (48:10–49:9).

On January 27, 2021, the SAO sent a letter to acting PGPD Police Chief Hector Velez containing the names of 15 officers who would no longer be called to testify, including Gross and Russell. ECF No. 49-9 at 3–4. Following receipt of the SAO's letter, PGPD leadership sought more information from within the department about the listed officers. On February 1, 2021, IG Turner emailed McCreary and Robinson (the officers in charge of IA), and a third non-Defendant officer. ECF No. 49-9 at 1. IG Turner's email stated that he was "not familiar with Gross" and another officer, and asked why they

were placed on the SAO's list. *Id.* IG Turner further wrote, "we should discuss whether/how we are going to challenge [the SAO's] decision." *Id.*

On February 10, 2021, the SAO sent a letter to Mark Magaw, who was then Deputy Chief Administrative Officer for Public Safety and Homeland Security for Prince George's County. ECF No. 49-10 at 12–16. The letter explained the basis for each officer's inclusion on the do-not-call list. *Id.* These summaries were drafted by ASA Joy. ECF No. 49-8 at 2 (Joy Dep. 40:4–18). The letter contains a single summary regarding the five officers—including Gross and Russell—who were included in the list in connection with the warrantless use of a GPS tracker on Henson's vehicle. ECF No. 49-10 at 12–13. This summary did not say anything specifically about Gross or Russell but generally stated that they and the three others had misled federal prosecutors about the warrantless use of a GPS tracker, which led to the dismissal of the case. *Id.* ASA Joy drafted the summary of the Henson incident as the result of her review of the officers' IA files, the Swonger memo, and her call with the AUSA. *Id.* at 2–6 (Joy Dep. 40:4–18, 42:3–42:10, 48:1–49:9).

The next day, February 11, 2021, an attorney from the Prince George's County Office of Law, Rhonda Weaver, sent several Prince George's County and PGPD employees (including acting-Chief Velez) an email regarding the SAO list. ECF No. 49-10. The email states as follows:

> As you are aware, the SAO initially sent a list at the end of January that included 15 officers that were no longer able to testify in criminal trials. DCAO Magaw asked for a letter that detailed why the officers were included on the list. The letter was provided yesterday. (Attached)
>
> Simultaneously, Jack Mitchell pulled together disciplinary/investigation information from the Police

> Department pertaining [to] the officers on the list. The information from the PD also includes, as requested, any information pertaining to civil judgements the County paid on behalf of the officers and well as demographic information. This is all provided on the attached list (Word document). On this Word document, comments in red were made by me noting anything thought to be of significance between the information included from PD and from SAO.
>
> I think the next step is to set up a meeting to discuss how to proceed. In addition, some of the cases involve discipline imposed pursuant to a discipline matrix. I would recommend *that the Police Department provide background information at this future* [sic] *as to how the matrix was created, when it ceased being used, was it part of an agreement with FOP, etc.* Noteworthy is that it appears that the discipline for false statement/misrepresentation included disciplinary actions less severe than termination.
>
> Please advise if you want OOL to arrange the meeting.

*Id.* at 1–2 (emphasis in original). As the body of the email indicates, Weaver attached both the February 10 SAO letter to DCAO Magaw as well as her own summary document containing further notes about each of the listed officers. *Id.* at 3–11. Regarding Gross and Russell, the document recounted accusations of misrepresentations or omissions in connection with the GPS tracker and the Henson case similar to those contained in the Swonger and Turner memos. *Id.* at 4–5, 7. At the end of the document, there is a table entitled "race and gender demographics of officers on the list," listing a demographic breakdown of officers on the list by race, ethnicity, and sex. *Id.* at 11.

In November 2021, the SAO decided to release a public version of the do-not-call list. *See* ECF No. 49-11 at 1 (Nov. 17, 2021 email from McCreary to Aziz containing a list of which officers were removed and which remained on the list, including summaries similar to Weaver's earlier email). In the public version of the list, several officers were

removed, but Gross and Russell remained on the list. *Id.* at 2–7. Plaintiffs contend that three of the officers whom the SAO removed before publicizing the list were Black and/or Hispanic, and that two additional Black or Hispanic officers were removed subsequently. ECF No. 49 at 18. Both Gross and Russell state in their interrogatory answers that they have since been removed from the do-not-call list, with Gross being removed in March 2023. ECF No. 46-2 at 14; ECF No. 46-3 at 10. But Plaintiffs also submitted what they contend is the "current" PGPD do-not-call list, and it still contains Gross (but not Russell, who as noted above has retired). *See* ECF No. 49-12.

**C. Procedural History**

Plaintiffs filed this case in April 2024. ECF No. 1. Their complaint asserted six counts:

1. First Amendment retaliation claim, brought by Plaintiff Gross only against several individuals employed at relevant times by Prince George's County: now-Senator Angela Alsobrooks, Aziz, McCreary, Jacqulyn Rafferty, Brad Pyle, Robinson, Swonger, and Turner (hereinafter, the "Individual Defendants");
2. Fifth and Fourteenth Amendment "stigma-plus" claims, brought by both Plaintiffs against the Individual Defendants;
3. Fifth and Fourteenth Amendment Equal Protection claims, brought by both Plaintiffs against the Individual Defendants;
4. Article 40 of the Maryland Declaration of Rights retaliation claims, brought by both Plaintiffs against all Defendants (the Individual Defendants plus Prince George's County itself and the PGPD);
5. Article 24 of the Maryland Declaration of Rights "stigma plus" claims, brought by both Plaintiffs against all Defendants; and

6. Article 24 of the Maryland Declaration of Rights Equal Protection claims, brought by both Plaintiffs against all Defendants.

*Id.* ¶¶ 83–118. The federal claims, Counts I–III, were brought pursuant to 42 U.S.C. § 1983. Defendants moved for summary judgment, and that motion is fully briefed. ECF Nos. 46, 49, 50. The Court held a hearing on July 22, 2026.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a "claim or defense—or the part of [any] claim or defense"—by showing that "there is no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if proof of its existence "might affect the outcome of the suit," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]ourts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (quoting *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a moving party carries this burden, then the Court will award summary judgment unless the non-moving party identifies specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). The "mere existence of a scintilla of evidence in support of the [opposing party's] position," however, is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. First Amendment Retaliation (Gross, Count I)

As explained above, the undisputed evidence establishes that Plaintiff Gross was a member of WAVE; that Gross was personally responsible for placing the warrantless GPS tracker on Henson's car; that the absence of a warrant was not disclosed to the federal prosecutors until just before a suppression hearing in the *Henson* case; and that the absence of the warrant and/or the officers' failure to disclose such absence led to the government's decision to voluntarily dismiss the *Henson* prosecution. It is also undisputed that two members of WAVE spoke with AUSA Sullivan about the issue on or about February 18, 2019: Detective Sean Kenney and Detective Gross. ECF No. 49-5 at 2. As discussed above, there is some ambiguity in the record about which call took place first, and thus whether it was Kenney or Gross who first disclosed the information to AUSA Sullivan. Either way, the basis for Gross's First Amendment retaliation claim is that, regardless of whether the use of the GPS tracker was unconstitutional, and even though that information had been withheld from the federal prosecutor, his conversation with AUSA Sullivan on or about February 18 constituted protected speech, and that his subsequent demotion and transfer by PGPD constituted retaliation for speaking with AUSA Sullivan about the GPS tracker and the WAVE confidentiality agreement. *See* ECF No. 49 at 24.[4]

The First Amendment generally prohibits government officials from engaging in retaliatory actions against an individual because of the individual's protected speech.

---

[4] In their opposition brief, Plaintiffs include arguments for why *Russell's* "failure to speak" was punished in violation of both the First Amendment and Maryland law. ECF No. 49 at 29 n.6. But Russell was not included in the complaint's First Amendment claim (Count I), only Gross. *See* ECF No. 1 ¶¶ 83–90.

*Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). "This remains true when speech concerns information related to public employment." *Hunter v. Town of Mocksville*, 789 F.3d 389, 396 (4th Cir. 2015). But "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Thus, courts faced with a retaliation claim by a government employee must balance the employee's First Amendment interest against "the government's countervailing interest in controlling the operation of its workplaces." *Lane v. Franks*, 573 U.S. 228, 236 (2014).

This analysis is accomplished in a three-step test. At the first step, the Court "determin[es] whether the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. "This [step] can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, *Garcetti*, 547 U.S. at 421, and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs[,]' *Connick* [*v. Myers*, 461 U.S. 138, 149 (1983)]." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017). In other words, a First Amendment retaliation claim by a public employee plaintiff requires that (a) the plaintiff spoke "as a citizen" rather than as an employee; and (b) the speech "addressed a matter of public concern" rather than private topics. *Id.* A failure to satisfy either requirement means "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. In analyzing whether allegations or evidence satisfy the first prong—whether the plaintiff spoke as a citizen or as an employee—courts conduct a "'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue

occurred in the normal course of those ordinary duties." *Hunter*, 789 F.3d at 397 (quoting *Garcetti*, 547 U.S. at 424). "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240.

The Court need not outline steps two and three of the overall test because Gross's claims fail at the first prong of step one: even construing the record in the light most favorable to him,[5] he spoke with AUSA Sullivan in his capacity as a police officer—or as the Fourth Circuit has put it, "in the normal course of [his] ordinary duties," *Hunter*, 789 F.3d at 397. Though Gross was not formally assigned to the Henson investigation, he undisputedly placed the tracker on Henson's vehicle at the direction of other detectives in the WAVE Unit who were performing an official investigation, and in his capacity as a member of the WAVE Unit, ECF No. 49-1 ¶ 4, even if his principal duties were as a member of the Organized Crime squad, rather than the Street Crimes squad, *id.* ¶¶ 2, 4, 7. The record also is undisputed that when Gross spoke to AUSA Sullivan he did so at the request of another WAVE Unit detective, ECF No. 49-1 ¶ 5; the conversation was related to an official investigation that Gross had participated in by placing the tracker, *id.* ¶¶ 4, 6; and Gross's purpose in making the call was, at least in part, "to ensure the federal prosecutor had accurate information about the GPS device," *id.* ¶ 8. Those undisputed facts establish that his conversation with AUSA Sullivan was

[5] Step one of the government employee First Amendment retaliation inquiry—"whether the employee spoke as a citizen on a matter of public concern," *Garcetti*, 547 U.S. at 418—is a "question[] of law" (as is step two, which the Court does not reach here). *Crouse*, 848 F.3d at 583. Questions of law are appropriately resolved at the summary judgment stage if there are no genuine disputes of material fact. *See Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 329 (4th Cir. 2006).

"in the normal course of [Gross's] ordinary duties" as a police officer. *Hunter*, 789 F.3d at 397.

Gross contends, in his declaration and opposition brief, that the phone call "was not part of [his] normal job duties" because he was "not the lead investigator on the Henson case," ECF No. 49-1 at 3, and that his duties did not *mandate* that he make the call because another purpose of his call was to "explain why other officers had not informed the federal prosecutor about the GPS device" and thus was akin to "defend[ing] his fellow employees in potential disciplinary matters." ECF No. 49 at 25–26 (citing *Janus v. AFSCME, Council 31*, 585 U.S. 878, 910 (2018)).

Even setting aside the questionable premise of the contention that Gross did not have a duty to inform AUSA Sullivan about the use of the GPS tracker once he knew that that information had been withheld, the test under *Garcetti* and the Fourth Circuit cases interpreting it is not whether Gross had a specific, mandatory duty to participate in the call with AUSA Sullivan. *See Shenoy v. Charlotte-Mecklenburg Hosp. Auth.*, 521 F. App'x 168, 172 (4th Cir. 2013) ("Speech that is 'not explicitly required as part of [an employee's] day-to-day job' may nevertheless fall within the scope of that employee's official duties.") (quoting *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 749 (10th Cir. 2010)). Instead, the legal question is whether he engaged in that conversation "in the normal course of [his] ordinary duties," on the one hand, or as a private citizen, on the other. *See Hunter*, 789 F.3d at 397. The undisputed record establishes that he did so in the former capacity, not the latter. He placed the tracker as a police officer, not a private citizen, and was discussing that job-related activity with the prosecuting attorney in the case. That is part of a law enforcement officer's job. *See Barnes v. City of New York*, Case No. 18-cv-7119 (LGS), 2025 WL 551505, at *6 (S.D.N.Y. Feb. 19, 2025)

("Police officers routinely and in the usual course of their duties . . . communicate with prosecutors."); *Biolchini v. City of Bend*, Case No. 09-cv-6216-TC, 2010 WL 5891613, at *8 (D. Or. Dec. 28, 2010) ("Discussions between officers and prosecutors are commonplace."), *report and recommendation adopted*, Case No. 09-cv-6216-TC, 2011 WL 748294 (D. Or. Feb. 24, 2011); *see also Crouse*, 848 F.3d at 585 (finding, in a qualified immunity analysis of a First Amendment retaliation claim, that it was reasonable for a police chief to believe that his officers were speaking in an official capacity when they went to speak with a victim of police misconduct in plain clothes and an unmarked car during their "unpaid lunch hour" because they "were clearly identified as police officers, and their speech more closely resembled their daily duties as police detectives"). This was not a disclosure to the news media or a public statement, or public testimony. *See, e.g.*, *Hunter*, 789 F.3d at 398 (collecting retaliation cases involving letters to the editor, leaking an internal report to news media, and sending a report to the State's Attorney and Governor's office); *Lane*, 573 U.S. at 240 (finding that public testimony was protected speech for purposes of a retaliation claim). Instead, it was a call between a police officer and a prosecutor. Even viewing the evidence in the light most favorable to Gross, his call to AUSA Sullivan was not made in his capacity as a private citizen.

At the hearing, and in their brief, Plaintiffs cited *Garcetti* and *Lane* for the proposition that speech that "concerns information acquired by virtue of . . . public employment does not transform that speech into employee—rather than citizen—speech." ECF No. 49 at 25 (quoting *Lane*, 573 U.S. at 240). That proposition of law is true but does not apply here. Gross's call to AUSA Sullivan is not unprotected merely

because it concerned police matters; it is unprotected because talking to prosecutors about aspects of an investigation was part of Gross's job.

And as for Gross's argument that he was calling AUSA Sullivan to "defend his fellow officers" and his citation to *Janus*, Gross's actions here were a far cry from negotiations over a collective bargaining agreement. *See Janus*, 585 U.S. at 910 ("[W]hen a union negotiates with the employer or represents employees in disciplinary proceedings, the union speaks for the *employees*, not the employer."). Gross was not, for example, testifying in defense of his colleagues at a disciplinary hearing (the Court is not suggesting that Gross's speech necessarily would be protected under *Janus* even if he was speaking in such a forum, but the facts would at least be closer). To the extent Gross provided an explanation to AUSA Sullivan for why the other officers had lied or concealed the use of the GPS tracker, such a conversation was still related to the ongoing prosecution. There is no genuine dispute of material fact that Gross spoke in his capacity as an officer.

For these reasons, Defendants are entitled to summary judgment regarding Gross's First Amendment retaliation claim (Count I).

### B. Article 40 (Gross and Russell, Count IV)

In addition to arguing that he was retaliated against for his speech in violation of the First Amendment of the U.S. Constitution, Gross contends that the same conduct violated Article 40 of the Maryland Declaration of Rights, which also protects free speech ("that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege").

As explained herein, Defendants are entitled to summary judgment on Plaintiffs' three federal-law claims (Counts I–III). Counts IV through VI are claims under

analogous provisions of Maryland's Declaration of Rights. *See* ECF No. 1 ¶¶ 108–118. A district court may decline to exercise supplemental jurisdiction over a state law claim if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). But "courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995); *see also Ramsay v. Sawyer Prop. Mgmt. of Md., LLC*, 948 F. Supp. 2d 525, 537 (D. Md. 2013) ("[S]upplemental jurisdiction is a doctrine of discretion, and not a plaintiff's right."), *aff'd*, 593 F. App'x 204 (4th Cir. 2014). "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan*, 58 F.3d at 110. Because the legal standards that apply to Gross's federal claims also apply to his corresponding state law claims, and because the parties have already invested resources in discovery and dispositive motions, the Court will retain supplemental jurisdiction over Gross's three state law claims.

Gross's Article 40 claim fails for the same reason his First Amendment claim fails. Plaintiffs contend the Article 40 claim should be analyzed differently than Gross's First Amendment claims because the language of Article 40 is different from the language of the First Amendment, and specifically that the tests outlined above regarding public employee speech do not apply under Maryland law. ECF No. 49 at 33–34. But the Supreme Court of Maryland has held that "[t]he protections accorded by Article 40 are generally 'coextensive' with the protections accorded by the First Amendment." *Newell v. Runnels*, 407 Md. 578, 608 (2009). In *Newell*, the court endorsed the *Pickering* balancing test for public employee speech retaliation claims—

the same test applied in the federal cases quoted above. *Id.* at 608–13. The cases Plaintiffs cite do not hold otherwise, but instead support a unified analysis. *See Clear Channel Outdoor, Inc. v. Dir., Dep't of Fin. of Balt. City*, 472 Md. 444, 457 (2021) ("Although the two constitutional provisions are worded differently and this Court has sometimes held out the possibility that Article 40 could be construed differently from the First Amendment in some circumstances, the Court has generally regarded the protections afforded by Article 40 as 'coextensive' with those under the First Amendment. Neither party has suggested that the circumstances of this case provide a reason for departing from that general rule, and we see none. Accordingly, our analysis of Clear Channel's contentions under the First Amendment applies equally to the same issues under Article 40.") (quoting *Newell*, 407 Md. at 608). For the same reasons as those stated above for Count I, Defendants are entitled to summary judgment on Gross's Article 40 claim (Count IV).

As for Russell, he contends his Article 40 rights were violated because Defendants retaliated against him for "failing or refusing to tell Gross not to disclose the secret confidentiality agreement[.]" ECF No. 49 at 29 n.6. But Defendants are entitled to summary judgment on Russell's claim too for similar reasons to those explained above concerning Gross. The speech that Russell contends Defendants wanted him to make—telling Gross not to disclose the existence of the confidentiality agreement—would have been in his capacity as an employee. Plaintiffs contend that the confidentiality agreement was a matter of official department policy in the WAVE Unit, mandated by the commanding officer. ECF No. 49-2 ¶ 3. Russell's speech or silence with respect to warning his subordinate (Gross) not to discuss a workplace policy with another law

enforcement official (Sullivan) falls purely within his duties as an employee. Accordingly, his Article 40 retaliation claim fails as a matter of law as well.

### C. "Stigma-Plus" claims (Counts II and V)

"The Supreme Court has acknowledged a constitutional liberty interest in one's reputation." *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021) (citing *Kerry v. Din*, 576 U.S. 86, 91–92 (2015)). But "reputation alone, apart from some more tangible interests such as employment," is not considered a "liberty" interest within the meaning of the due process clause of the Fifth Amendment. *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 725 (1976)). In the "narrow . . . category of cases" in which courts recognize a cause of action in this area, "[a] litigant must show [(1)] a statement 'stigmatizing his good name' and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that 'alter[s] or extinguishe[s] one of his legal rights.'" *Id.* (quoting *Paul*, 424 U.S. 693 at 706–11). Maryland also recognizes this type of claim, which is sometimes referred to as a "stigma-plus" claim, under the Maryland Declaration of Rights. *Doe v. Dep't of Publ. Safety & Corr. Servs.*, 185 Md. App. 625, 641–44 (2009). The elements of a stigma-plus claim under Maryland law are the same as under federal law, as listed above. *Id.* at 632–33. The loss of employment or injury, to be actionable, must be due to the stigmatizing statement. *Paul*, 424 U.S. at 706; *Doe*, 185 Md. App. at 645–46.

Plaintiffs Gross and Russell assert "stigma-plus" claims under federal law (Count II) and Maryland law (Count V). In their summary judgment briefing, Plaintiffs clarified that their claims are premised on Lt. Swonger's February 2021 memo, which they claim contained "false and misleading statements" about them. ECF No. 49 at 30. Specifically, they point to the statements that Gross "[misled] and then provided false information to

the US Attorney in several preparatory meetings" and that Gross and Russell "knew the GPS unit was illegally placed on Henson's vehicle." ECF No. 49-7 at 4–5.

But even assuming those statements were "false and misleading" (which the Court need not and does not decide), Defendants are entitled to summary judgment on these claims because Plaintiffs' claims fail on element two: the undisputed evidence establishes that Defendants' allegedly false statements were not disseminated or published. Plaintiffs contend that the evidence satisfies the "dissemination or publication" element because the Swonger memo was "disseminated by PGPD to the SAO," where ASA Joy "relied on" the memo in preparing the do-not-call list. ECF No. 49 at 30. In other words, Plaintiffs' stigma-plus claims do not rely upon the do-not-call list itself, which was disseminated publicly by the SAO (and neither the SAO nor any member of that office is a defendant in this case). Rather, Plaintiffs' theory is that they may recover against County-employed Defendants based on the Swonger memo because (1) it was effectively published via the do-not-call list and (2) the memo was placed in Plaintiffs' personnel files, and thus could theoretically be disseminated to prospective employers. *See id.* As support for the personnel file argument, Plaintiffs cite *Cannon v. Village of Bald Head Island, North Carolina* for the proposition that the dissemination prong can be satisfied by "a *likelihood* that prospective employers . . . or the public at large will inspect the [stigmatizing]" information. 891 F.3d 489, 503 (4th Cir. 2018) (quoting *Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007)).

Regarding the transmission of the Swonger memo (or any other information) from the PGPD to the SAO, binding precedent forecloses Plaintiffs from characterizing that as dissemination for stigma-plus purposes. In *Elhady*, numerous plaintiffs sued in connection with their inclusion on the Terrorist Screening Database ("TSDB"), which is

maintained by several federal agencies. 993 F.3d at 213–16. The Fourth Circuit held that the plaintiffs could not prevail on their stigma-plus claims because "[t]he government does not publicly disclose TSDB status" and the "*intragovernmental dissemination* of TSDB information to other federal agencies and components, to be used for federal law enforcement purposes, *is not 'public disclosure' for purposes of a stigma plus claim*." *Id.* at 225 (emphases added). The federal agencies' disclosure of information to "state or tribal law enforcement agencies" did not give rise to liability either, because the "government could not function if every intra- or inter-departmental memo critical of a person created a constitutional claim." *Id.* at 225–26. The same reasoning applies here. Plaintiffs cannot recover through a stigma-plus claim against employees of the PGPD for disseminating a memorandum to another law enforcement agency, the SAO.[6]

Plaintiffs' second argument, that the stigmatizing statements were disseminated via inclusion in personnel files, is unsupported by the record. To show dissemination under this theory, Plaintiffs must either prove (1) "that [their] former employer has a practice of releasing personnel files to all inquiring employers" or (2) "that although [their] former employer releases personnel files only to certain inquiring employers, . . . [they] intend[] to apply to at least one of these employers." *Sciolino*, 480 F.3d at 650. "In either case, [Plaintiffs] must allege that the prospective employer is likely to request the file from [their] former employer." *Id.*; *see also Cannon*, 891 F.3d at 503 (finding dissemination where there was "no dispute that Defendants placed the [stigmatizing]

[6] By including the Swonger memo among their filings in this case, of course, *Plaintiffs* have now made the accusations contained in that document public, though that fact does not bear on any of the reasons Defendants have established their entitlement to summary judgment as explained herein.

termination letters in the Officers' personnel files"). Though Plaintiffs contend in their declarations that the *do-not-call* list has harmed their future employment prospects, their opposition brief cites no evidence to support the contention that their personnel file is likely to be disseminated. *See* ECF No. 49 at 30–31. The Court's own review of the record does not reveal any support either. To the contrary, Gross stated in his interrogatory answers that "[IA] personnel files are considered confidential records." ECF No. 46-2 at 4; *see also* ECF No. 46-5 at 18 (Deposition of Aisha Braveboy 65:14–19) ("Q. I assume that you didn't have routine access to the personnel files of the police department, did you? A. No."). Russell's declaration and interrogatory responses indicate that he has had difficulty gaining employment since his retirement from PGPD, but he attributes that to his inclusion on the do-not-call list, *not* to prospective employers gaining access to his personnel file and thereby viewing the Swonger memo. *See* ECF No. 49-2 ¶ 13 ("I know that the reason I have been unable to find a new job is because I was placed on the Do Not Call list and publicly defamed in the media for their personal gains."). Gross's interrogatory responses indicate the same. *See* ECF No. 46-2 at 13 ("Due to my name being added to the 'Do Not Call' list, I was unable to obtain employment with any other law enforcement agencies.").

In summary, Plaintiffs cannot recover for inter-agency dissemination of information by PGPD officers and there is no evidence from which a reasonable juror could conclude that stigmatizing information would be disseminated via Plaintiffs' personnel records. Thus, Plaintiffs' "stigma-plus" claims fail on the dissemination prong (and the Court does not and need not reach the other elements of the test). As Plaintiffs concede, the analysis of "stigma-plus" claims under federal and Maryland law is the

same. *See* ECF No. 49 at 35. For these reasons, Defendants are entitled to summary judgment on Counts II and V.

**D. Equal protection (Counts III and VI)**

Plaintiffs' last claims are under the Equal Protection Clause of the Fourteenth Amendment (and equivalent Maryland law). The nature of Plaintiffs' equal protection claims has changed somewhat since their complaint. In the complaint, Plaintiffs, who are White, claimed that they were placed on the do-not-call list while "other similarly situated officers who were not white received more favorable treatment." ECF No. 1 ¶ 106. At this stage, however, Plaintiffs have focused not upon their initial *placement* on the list, but rather the fact that they were not *removed*. Their summary judgment briefing pointed to five "comparator" officers who they contend were on the initial list, were Black or Hispanic, committed misconduct that Plaintiffs allege was worse than either Gross or Russell's, but *were* removed from the do-not-call list, while Plaintiffs were not removed (or, at least, that those other officers were removed from the list before Plaintiffs were—as explained above, the record is not entirely clear on whether they are still on the do-not-call list themselves). ECF No. 49 at 32–33. At the hearing, counsel for Plaintiffs confirmed that their equal protection argument was based on information Defendants gave the SAO following the creation of the initial list, stating that Defendants "provide[d] false and misleading information about my clients to the prosecutor and . . . truthful information about other similarly situated [officers] who are minorities who then get removed from the list."

"[A] state cannot 'purposely discriminate between individuals on the basis of race' without running afoul of the Fourteenth Amendment." *Ass'n for Educ. Fairness v. Montgomery Cnty. Bd. of Educ.*, 560 F. Supp. 3d 929, 950 (D. Md. 2021) (quoting *Shaw*

*v. Reno*, 509 U.S. 630, 642 (1993)) (alterations omitted). "To plead an equal protection violation, a plaintiff must satisfy a two-part test." *Katti v. Arden*, 161 F.4th 217, 226 (4th Cir. 2025). First, the plaintiff "must plausibly allege that the defendant treated [the plaintiff] differently than someone else 'similarly situated' in all relevant respects." *Id.* (quoting *Doe v. Settle*, 24 F.4th 932, 939 (4th Cir. 2022)). Second, the plaintiff "must plausibly allege that, under the appropriate level of constitutional scrutiny, the difference in treatment is unjustified." *Id.*

Plaintiffs' equal protection claims fail because there is no evidence that any specific Defendant *did* treat them differently than the similarly situated comparators by providing different kinds of information to the SAO, let alone that any Defendant did so because of Plaintiffs' race. *Katti*, a recent Fourth Circuit case, helps illuminate this central flaw. 161 F.4th at 227. Katti, the plaintiff, was an Indian professor who sued under the Equal Protection Clause alleging racial discrimination in a denial of tenure. *Id.* at 222–23. Katti did not seek damages from the university or the tenure committee but instead sued individual faculty members. *Id.* One of the faculty members was alleged to have written a memorandum that was critical of Katti, and another had allegedly "included false . . . criticisms in his end-of-year performance reviews and in his letter to the tenure decisionmakers." *Id.* at 223. Katti alleged that other similarly situated White professors did receive tenure. *Id.* The Fourth Circuit affirmed the district court's dismissal of Katti's complaint, including the equal protection claims. This was in part because Katti had not sufficiently alleged whether the faculty members had any role in the tenure committee's decision (and, if so, what role): "Without an allegation that *these* defendants were involved, there is no way the district court could have reasonably inferred that they treated Katti and a similarly situated comparator differently. Try as he

might, Katti cannot pin the institutional actions of [the university] on the individual defendants in this case." *Id.* at 227.

Here, Plaintiffs have not identified anything in the record that would constitute admissible evidence that any particular Defendant played a role in getting the comparator Black or Hispanic officers off the do-not-call list, let alone in a manner that was different than their treatment of Plaintiffs and other White officers. To be sure, Plaintiffs have provided emails between certain Defendants discussing the initial list, *see* ECF No. 49-9, and have provided the final list, on which some of the comparator officers had been removed, *see* ECF No. 49-11. But there is no evidence of the alleged interim step. Plaintiffs have not uncovered, for example, emails from any particular Defendant to the SAO advocating for the Black and Hispanic officers' removal. Nor is there any deposition testimony to that effect. The only evidence of any Defendant pushing back on particular officers who were included on the do-not-call list was ASA Joy's deposition testimony regarding Corporal Todd Fowble: "[W]hen it comes to Fowble, there was a lot of discussion between us and the police department. They did not want him included. And I know we just really disagreed with the police department's assessment of what happened. . . . And ultimately, we just said . . . no, we're keeping him on." ECF No. 46-4 at 60 (Joy Dep. 59:2–13). But Mr. Fowble is White. *See* ECF No. 46-3 at 5–6 (listing Mr. Fowble as among the "innocent white males" that were placed on the do-not-call list).[7] Even construing the existing record in the light most favorable to Plaintiffs, there is no evidence from which a reasonable juror could conclude that any specific, individual

---

[7] Mr. Fowble has brought his own lawsuit against many of the same defendants named in this case. *Todd Fowble v. Prince George's Cnty., Md.,* Case No. 24-cv-1019-PX (D. Md.).

Defendant treated Plaintiffs differently than any of the proposed comparators regarding efforts to advocate for the SAO to remove them from the do-not-call list. The primary evidence that Plaintiffs have is that the comparators were removed. But any conclusion regarding a specific Defendant's actions to advocate for a comparator's removal based on this would be pure speculation. A reasonable juror would not be able to infer, based merely upon Russell and Gross's continued presence on the list, that the PGPD did or did not advocate for their removal, and/or that this hypothetical advocacy or lack of advocacy caused Russell and Gross to not be removed.

As Plaintiffs concede, their equal protection claim under Maryland law is analyzed in the same manner as their Fourteenth Amendment claim. ECF No. 49 at 35. Accordingly, Defendants' motion for summary judgment is granted as to Counts III and VI.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment. A separate order follows.

Date: September 29, 2026

_____/s/_____________
Adam B. Abelson
United States District Judge